**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**BRITTANY A.,**

               **Plaintiff,**

     **v.**                         **Civil Action 2:20-cv-6549**
                                 **Judge Sarah D. Morrison**
                                 **Magistrate Judge Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

               **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Brittany A., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.     BACKGROUND

Plaintiff protectively filed her application for SSI on February 12, 2018, alleging disability beginning August 1, 2010. (Doc. 13, Tr. 188–93). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held the hearing on January 17, 2020. (Tr. 35–57). On January 30, 2020, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 12–34). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on December 24, 2020 (Doc. 1), and the Commissioner filed the administrative record on June 15, 2021 (Doc. 13). The matter has been briefed and is ripe for consideration. (Docs. 16, 19, 26).

A.       **Relevant Medical History and Hearing Testimony**

1.       **Medical History**

The ALJ summarized Plaintiff's Medical History as to her mental health impairments as follows:

> *** The medical record reflects a history of mental impairments. [Plaintiff] reported feeling depressed with difficulty sleeping, some thoughts of self-injurious behavior, and anxiety with panic attacks four to five times a week. (Exs. 6F; 13F.) She had some stressful situations going on in her life, including breaking up with her significant other, but she was able to attend and share a table to sell her crafts at First Friday, manage her fan page, and start learning Korean. (Ex. 13F/3.) Mental status exams showed depressed mood with tearful affect and reported thoughts of self-injurious behavior. However, they generally showed that [Plaintiff] was alert, fully oriented, well-groomed, and cooperative with good eye contact, no agitation, normal speech, appropriate thought processes, focused memory, average fund of knowledge, average intelligence, and good insight and judgment. (Exs. 6F/4, 7.) [Plaintiff] is treated with psychotropic medications and a sleep aid. (Exs. 6F; 12F.) Her medications were adjusted, and [Plaintiff] reported significant improvement in her depression symptoms. (Exs. 6F/7, 10, 13, 16; 10F/1; 12F/1.) However, she developed some anxiety. (Exs. 6F; 7F.) Subsequent mental status and psychiatric exams showed some anxious mood but otherwise were unremarkable. (Exs. 6F/7, 10, 13, 16; 7F/9; 10F/2; 12F/1.) In August 2018, [Plaintiff] reported that she spent hours painting and enjoyed it. (Ex. 12F/1.)
>
> In September 2018, [Plaintiff] presented with thoughts of self-injurious behavior with a plan. She indicated that she had been crying daily, feeling helpless and hopeless, and did not want to get out of bed. She did not feel safe. She was referred to and was admitted for psychiatric hospitalization. She was treated with individual and group therapy, and her medications were adjusted. She was discharged three days later in stable condition. (Ex. 11F/28, 38.) Mental status exam on discharge revealed fair eye contact, fair insight, and fair judgment, but [Plaintiff] was alert, fully oriented, cooperative, and spontaneous with better mood, appropriate affect, normal speech, unremarkable thought content, goal-directed thought processes, intact attention and concentration, and intact recent and remote memory. (Ex. 11F/39.)
>
> At an October 2018 follow-up visit, [Plaintiff] reported that she was feeling a little down but doing pretty good, and her medication adjustment had been helpful. (Ex. 8F/7.) She was able to attend a drum circle and travel to Chicago to see her favorite band. She reported that she was able to socialize with strangers in the park, coffee shops, and that the concert. She further reported that she was selling her artwork. (Ex. 13F/17, 19.) She reported dry-walling, painting and performing other maintenance tasks for money in her apartment complex (Ex. 18F/3). Mental status exam showed fair insight and fair judgment but otherwise was unremarkable. (Ex.

8F/7.) At subsequent visits with her mental health providers, [Plaintiff] reported some anxiety with panic attacks, some depressed mood, and some thoughts of self-injurious behavior. She described past abuse and trauma and endorsed PTSD symptoms of recurrent unwanted memories of past traumatic events, night terrors, flashbacks, avoidance of triggers, hopelessness, and significant relationship problems. However, she indicated that she was not anxious when she was busy reading or making art, she had good support with close friends, and she had a nice Christmas. (Exs. 12F/10; 13F/21, 29.) [Plaintiff]'s medications were adjusted. (Ex. 12F/12.) Subsequent mental status exams showed some depressed mood, sad affect, and fair insight and judgment, but were otherwise unremarkable, as [Plaintiff] was alert, fully oriented, well groomed, and cooperative with good eye contact, no agitation, normal speech, appropriate thought processes, focused memory, average fund of knowledge, and average intelligence. (Exs. 12F/10; 18F/5, 14, 21, 28.)

In February 2019, [Plaintiff] returned for psychiatric hospitalization for thoughts of self[-]injurious behavior with a plan. She indicated that her night terrors, depression, and anxiety had worsened. [Plaintiff] was treated with therapy and medication adjustments. She reported feeling great at discharge and was noted to be bright and social on the unit. [Plaintiff] was discharged in stable condition four days later. (Ex. 14F/14, 29, 30.) She reported to her therapist that this incident was due to her being close to her stepfather, who is a trigger for her anxiety (Ex. 18F/21.) In March 2019, [Plaintiff] underwent a follow-up Diagnostic Assessment with physician assistant Marie McGinnis. [Plaintiff] reported constant anxiety, depression, night terrors, guilt, history of self-mutilation, flashbacks, depersonalization, and anxiety with panic attacks. Mental status exam showed reported thoughts of self-injurious behavior, impaired memory, and impaired attention/concentration. However, [Plaintiff] was alert, fully oriented, appropriately groomed, and cooperative with average eye contact, average demeanor, clear speech, euthymic mood, full affect, logical thought processes, and average intelligence. Ms. McGinnis diagnosed PTSD. (Ex. 18F/31-35.) At subsequent mental health visits throughout 2019, [Plaintiff] reported some difficulty sleeping, some social isolation, some disassociation with trigger words, and continued thoughts of self-injurious behavior. However, she noted some improvement in her mood with the medication adjustments. She was able to get out, ride her bike, go back to Chicago for a concert, and attend meditation circles. She was able to contract for safety. She further reported that she was able to go on dates, have tea parties with friends, go to parties, and make new friends. She was able to travel to Texas to visit a new boyfriend. (Ex. 18F/38, 41, 49, 65, 67, 81.) At the hearing, [Plaintiff] indicated that she took public transportation (bus) to Texas. Subsequent mental status exams showed some depressed mood, and fair insight and judgment, but were otherwise unremarkable, as [Plaintiff] was alert, fully oriented, well-groomed, and cooperative with appropriate affect, good eye contact, no agitation, normal speech, appropriate thought processes, focused memory, average fund of knowledge, and average intelligence. (Ex. 18F/38, 45, 53, 62, 69, 83.) At the last

3

visit in the record in November 2019, [Plaintiff] reported to her provider that she did nothing her medication needed to be changed (Ex. 18F/85).

(Tr. 22–23).

### 2.    Relevant Hearing Testimony

The ALJ summarized Plaintiff's statements to the agency and the relevant hearing testimony:

> [Plaintiff] testified that she experiences severe anxiety with daily panic attacks, which bring on vertigo, nausea, heart palpitations, and occasional vomiting. Her panic attacks are random and she knows of no particular trigger. She submitted her panic attack diary as evidence. She further testified that she has racing thoughts, difficulty sleeping, disassociation, blackouts, and feeling catatonic for 15 minutes to an hour at a time. She indicated that she was admitted for psychiatric hospitalization because her symptoms got worse and she felt like she was losing control. Regarding her functional limitations, [Plaintiff] alleged that her impairments have negatively affected her ability to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. When asked about her activities of daily living, [Plaintiff] indicated that she is independent with personal care, and she is able to care for her cat, prepare simple meals, dust and wash dishes for short periods with encouragement, and shop in stores. She enjoys doing photography, painting, drawing, and reading to help her stay calm. She reads Shakespeare and Tolstoy. She testified that she does not drive due to anxiety, and she rarely leaves her house. She does not socialize other than seeing a friend once a month who usually comes to her house. She acknowledged that she has not gone to the division of vocational rehabilitation for job training. (Exs. 2E; 3E; 5E; 6E; 11E; 15E; 17E.)

(Tr. 21–22).

### B.    The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since January 2, 2018, the application date.  (Tr. 17).  The ALJ determined that Plaintiff suffered from the following severe impairments: depression, anxiety, posttraumatic stress disorder (PTSD), and obesity.  (*Id.*).

The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met

or medically equaled a listed impairment.  (Tr. 18).

    As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined
> in 20 CFR 416.967(a). She is able to lift and carry 10 pounds occasionally and less
> than 10 pounds frequently, stand and/or walk two hours in an eight-hour workday,
> and sit six hours in an eight-hour workday. She occasionally can operate foot
> controls bilaterally and reach overhead bilaterally. She occasionally can balance,
> stoop, kneel, crouch, crawl climb, and climb ramps, stairs, ladders, ropes, and
> scaffolds. She should have no exposure to unprotected heights and no commercial
> vehicle operation, but she can have frequent exposure to moving mechanical parts.
> [Plaintiff] is limited to simple, routine tasks and simple work-related decisions with
> occasional contact with coworkers and supervisors, and no contact with the public.

 (Tr. 20–21).

    Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence."  (Tr. 27).

    The ALJ determined that Plaintiff has no past work history.  (Tr. 28, 53).  Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy, such as an assembler, inspector, or packer.  (Tr. 28–29).  She therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since January 2, 2018, the date the application was filed (20 CFR 416.920(g))."  (Tr. 29).

## II.    STANDARD OF REVIEW

    The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."  *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g).  "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  The Commissioner's findings of fact must also be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.   DISCUSSION

In her Statement of Errors, Plaintiff contends that: (1) the ALJ improperly explained why she declined to adopt the opined limitations of state agency psychologists into the RFC; and (2) 42 U.S.C. § 902(a)(3), which limits the power of the President of the United States to remove the Commissioner of Social Security without cause, violates the separation of powers doctrine, and thus, the Commissioner's delegation of power to the ALJ who adjudicated her claim was defective. (*See* Doc. 16).

The Commissioner counters that the ALJ properly analyzed conflicting medical opinions about Plaintiff's mental health limitations.  Rather than adopt any one opinion verbatim, the Commissioner says, the ALJ crafted an RFC that took into consideration the record as a whole, including later medical evidence.  In so doing, the restrictions the ALJ incorporated in the RFC finding were somewhat greater than the consultative examiner opined and somewhat lesser than the state agency reviewing psychologists opined, and the ALJ more than adequately explained this RFC determination.  The Commissioner further counters that Plaintiff's separation of powers argument does not entitle her to a rehearing of her disability claim, and her rehearing request should further be denied under the harmless error doctrine, the *de facto* officer doctrine, the rule of necessity, and broad prudential considerations.  (*See* Doc. 19).

6

### A.  Evaluation of State Agency Psychologists' Opinions

Plaintiff argues that the ALJ erred by not properly explaining why she declined to adopt the limitations opined by state agency psychologists Drs. Edwards and Haskins into her RFC.  (Doc. 16 at 9).  Particularly, Plaintiff says the ALJ should have provided an explanation why she did not adopt: (1) an accommodation that Plaintiff required "a static work environment without strict time or production quotas[;]" (2) an adaptation limitation that accounted for her "need for major changes to be explained in advance with gradual implementation to allow for adjustment[;]" and (3) a limitation to "only superficial interaction with others."  (*Id.*).

Because Plaintiff filed her application after March 27, 2017, it is governed by the new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. § 416.913(a), 416.920c (2017).  A [Plaintiff]'s RFC is an assessment of "the most [a [Plaintiff]] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1) (2012).  A [Plaintiff]'s RFC assessment must be based on all the relevant evidence in his or her case file. *Id.* The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]   20 C.F.R. § 416.913(a)(1)–(5).  Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 416.913(a)(2), (5).

sources." 20 C.F.R. § 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 416.920c(c)(1)–(5).  Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. § 416.920c(b)(2).  And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so.  *Id*.  If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [he or she] considered the other most persuasive factors . . . . . " § 416.920c(b)(3).

As for the relevant opinion evidence, the ALJ found,

State agency psychological consultants Joseph Edwards, PhD, and Kristin Haskins, PsyD, opined that [Plaintiff] can understand and remember 1 to 4 step instructions. She is capable of short cycle tasks in a static environment without strict time or production quotas, and she is capable of superficial and intermittent contact with others in less public settings. They further opined that major changes should be explained in advance with gradual implementation to allow for adjustment. (Exs. 1A/10-12; 3A/11-13.) The undersigned finds Dr. Edwards's and Dr. Haskins's opinions fairly persuasive. They are familiar with the agency's rules and regulations, they had the opportunity to review the record, their opinions are supported by their analyses of the record, and their opinions are fairly consistent with the record as a whole. As noted above, the medical record reflects a history of depression, anxiety, and PTSD. (Exs. 6F; 8F; 12F; 18F; 19F.) [Plaintiff] was hospitalized twice during the period at issue for thoughts of self-injurious behavior with plans. Her medications were adjusted, her symptoms improved, and she was discharged in stable condition after only a few days. (Exs. 11F/28, 38; 14F/14, 29, 30.) Although [Plaintiff] reported that she rarely went out and socialized, mental health progress notes reflect that she led a fairly active lifestyle. She was able to sell her artwork, keep up a fan page, participate in craft shows, attend concerts, engage with strangers at coffee shops and parks, attend parties, visit with friends, go on dates, and drive to Chicago and Texas. (Exs. 13F; 18F.) Mental status exams

8

> showed some depressed mood, and fair insight and judgment, but were otherwise unremarkable, as [Plaintiff] was alert, fully oriented, well-groomed, and cooperative with appropriate affect, good eye contact, no agitation, normal speech, appropriate thought processes, focused memory, average fund of knowledge, and average intelligence. (Exs. 8F/7; 12F/10; 18F/5, 14, 21, 28, 38, 45, 53, 62, 69, 83.) These findings reflect that [Plaintiff] is limited to simple, routine tasks and simple work-related decisions with occasional contact with coworkers and supervisors, and no contact with the public.

(Tr. 26–27).

As the ALJ identified, the state agency psychologists opined Plaintiff was capable of work with the following limitations: (1) "short cycle tasks in a static environment without strict time or production quotas[;]" (2) "superficial and intermittent contact with others in less public settings[;]" and (3) "major changes . . . explained in advance with gradual implementation to allow for adjustment." (Tr. 26 (citing Tr. 68–69, 84)). In other words, the state agency psychologists noted limitations in Plaintiff's abilities for sustained concentration and persistence, social interaction, and adaptation. The ALJ declined to adopt all three of these opined limitations into the RFC determination, despite finding the opinions of the state agency psychologists "fairly persuasive" and "fairly consistent with the record as a whole." (*Id.*).

At the outset, the Undersigned notes that an ALJ is not required to recite medical opinions verbatim. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). And certainly, where, as here, an ALJ has qualified an opinion as being "fairly" persuasive, the ALJ need not include all opined limitations in an RFC. Still, an ALJ must provide an explanation that allows this Court to conduct a meaningful review of the decision. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (noting that an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'" (quoting 5 U.S.C. § 557(c)(3)(A))).

In narrowing the state agency psychologists' opined limitations to a less restrictive RFC for "simple, routine tasks and work-related decisions with occasional contact with coworkers and supervisors, and no contact with the public[,]" the ALJ relied on findings from the record which did not clearly address Plaintiff's abilities for sustained concentration and persistence or adaptation. For instance, though the ALJ noted that Plaintiff was able "to sell her artwork," which could be suggestive of sustained concentration and persistence, the ALJ did not provide any explanation linking that finding with Plaintiff's ability. (Tr. 26). And indeed, though the record demonstrates that Plaintiff reported to her mental health provider that she "recently completed and was paid for an art project" (Tr. 563), that alone does not patently demonstrate an ability for sustained concentration and persistence. As might, say, a record that Plaintiff completed several art commissions with deadlines. In other words, the ALJ built no logical bridge explaining her decision to not adopt the opined limitation for a static environment without strict time or production quotas into Plaintiff's RFC. Similarly, the ALJ did not provide an explanation using the record that clearly connected to Plaintiff's ability to adapt and the appropriateness of the opined limitation for major changes to be explained in advance with gradual implementation.

Most of the findings invoked by the ALJ in making the bridge between the opined limitations and the RFC were about Plaintiff's social life. She noted that "[a]lthough [Plaintiff] reported that she rarely went out and socialized, mental health progress notes reflect that she led a fairly active lifestyle. She was able to sell her artwork, keep up a fan page, participate in craft shows, attend concerts, engage with strangers at coffee shops and parks, attend parties, visit with friends, go on dates, and drive to Chicago and Texas." (Tr. 26 (citing Tr. 555–98, 670–757)). This is all suggestive that the ALJ believed the Plaintiff was capable of occasional interaction, as set forth in the RFC, as opposed to superficial and intermittent interaction, as opined by the state agency

10

psychologists. But the ALJ did not explain how these aspects of the record informed her decision. This is particularly significant because the ALJ eliminated the superficial interaction aspect of the opined limitation.

While an ALJ may substitute an opined superficial interaction limitation with an occasional interaction limitation, it requires careful explanation. Superficial interactions and occasional interactions are not coextensive. "'Occasional contact' goes to the quantity of time spent with [] individuals, whereas 'superficial contact' goes to the quality of the interactions." *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018) (quoting *Hurley v. Berryhill*, No. 1:17-CV-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018)), *report and recommendation adopted*, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019). Because superficial and occasional are not the same, an ALJ may not replace a social functioning limitation regarding superficial interactions with one regarding occasional interactions, absent adequate explanation. *See e.g.*, *Runyon v. Comm'r of Soc. Sec.*, No. 2:20-CV-3820, 2021 WL 3087639, at *4 (S.D. Ohio July 22, 2021) (remanding where ALJ gave "some" weight to opinion that plaintiff was limited to superficial interactions but erroneously attempted to incorporate that opinion into the RFC by limiting plaintiff to occasional interaction without explaining the substitution) *report and recommendation adopted*, No. 2:20-CV-3820, 2021 WL 3489615 (S.D. Ohio Aug. 9, 2021).

In the present case, it may well be that the ALJ considered the nature of Plaintiff's social life to speak not only to the quantity of interactions of which she was capable in the workplace, but also the quality of interactions of which she was capable. Yet the ALJ failed to explain precisely how she weighed those findings. Nor are the findings so patently suggestive that Plaintiff was capable of quality social interaction to render a superficial interaction clearly unnecessary.

Further, other portions of the opinion do not sufficiently provide an explanation for the ALJ's reasoning.  For example, in step three the ALJ found that Plaintiff had moderate limitation in all four areas of functioning, including the three that are most relevant here: interacting with others, concentrating, persisting, or maintain pace, and adapting or managing oneself.  (Tr. 19–20).  The state agency psychologists found the same.  (Tr. 64, 81).  So the ALJ's view of the degree of limitation is not inherently incompatible with that of the state agency psychologists.

In response, the Commissioner relies upon the ALJ's treatment of consultative psychologist Floyd Sours's opinion, which recommended mild limitations for Plaintiff's RFC, as explanation of her reasoning.  (Doc. 19 at 16–17).  While the ALJ's RFC clearly occupies a middle ground between the limitations opined by the state agency psychologists and those opined by Dr. Sours, which the ALJ considered "somewhat persuasive[,]" the compromise between two persuasive opinions alone does not explain the ALJ's reasoning.  (Tr. 24).  The ALJ's departure from Dr. Sours's opinion is made with similarly brief notations of medical evidence as those above.  In fact, aside from a couple additional sentences about Plaintiff's panic attacks and PTSD, the evidence is described identically:

> [Plaintiff] reported some improvement in her mood with medication adjustments, but she continued to have recurring thoughts of self-injurious behavior and anxiety with panic attacks. She also began opening up about past traumatic events and endorsed PTSD symptoms of memories and flashbacks of past traumatic events, night terrors, avoidance, and phobias. (Exs. 13F; 18F.) In September 2018 and February 2019, [Plaintiff] was admitted for psychiatric hospitalization due to thoughts of self-injurious behavior with plans. Her medications were adjusted, her symptoms improved, and she was discharged after only a few days in stable condition. (Exs. 11F/28, 38; 14F/14, 29, 30.) However, despite her impairments, [Plaintiff] reported a fairly active and engaged lifestyle. She was able to sell her artwork, keep up a fan page, participate in craft shows, attend concerts, engage with strangers at coffee shops and parks, visit with friends, go on dates, and drive to Chicago and Texas. (Exs. 13F; 18F.) Mental status exams showed some depressed mood, and fair insight and judgment, but were otherwise unremarkable, as [Plaintiff] was alert, fully oriented, well-groomed, and cooperative with appropriate affect, good eye contact, no agitation, normal speech, appropriate thought processes, focused memory, average fund of knowledge, and average intelligence. (Exs. 8F/7; 12F/10; 18F/5, 14, 21, 28, 38, 45, 53, 62, 69, 83.) These

12

findings reflect that [Plaintiff] is limited to simple, routine tasks and simple work-related decisions with occasional contact with coworkers and supervisors, and no contact with the public.

(Tr. 25).  This perfunctory recitation of the relevant medical evidence fails to provide insight into how the ALJ considered the opined limitations.

At base, the Court cannot substitute its own reasoning for the ALJ's when the ALJ has not clearly explained how she arrived at her decision.  Because the ALJ did not meaningfully explain why she declined to adopt the several additional limitations opined by the state agency psychologists in an opinion she otherwise found "fairly persuasive," the Undersigned does not find that her RFC determination was supported by substantial evidence.  Accordingly, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

### B.  Separation of Powers

Plaintiff also contends that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security, Andrew Saul, violated the separation of powers doctrine, and therefore, the decision to deny her benefits was made by individuals who lacked a proper delegation of power to make benefits determination.  This contention lacks merit.

#### 1.    Plaintiff's Constitutional Claim is Procedurally Improper

As an initial matter, the claim is procedurally improper.  Plaintiff's Complaint does not include any Constitutional claims.  (Doc. 5).  Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, however, that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

13

At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id*.  Here, the United States Supreme Court case upon which Plaintiff bases her Constitutional claim was decided on June 20, 2020.  Yet Plaintiff gave no notice, let alone fair notice, of her Constitutional claim in her December 28, 2020, Complaint.  *See John R. v Comm'r of Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same).  For that reason, she failed to comply with Rule 8.

2.    Plaintiff's Constitutional Claim Lacks Merit

But even if Plaintiff's Complaint was rule compliant, her Constitutional claim lacks substantive merit.  Removal of the Commissioner is governed by 42 U.S.C. § 902(a)(3) which provides that the Commissioner may only be removed from office "pursuant to a finding by the President of neglect of duty, malfeasance in office."  *Id*.  The parties agree that two recent United States Supreme Court cases cast doubt on the constitutionality of that provision.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme Court held that a provision that allowed the president to remove the Director of the Consumer Financial Protection Bureau ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President.  140 S.Ct. 2183, 2197 (2020).  In *Collins v. Yellin*, decided one year later, the Supreme Court held that a provision limiting the President to removing the Director of the Federal Housing Finance Agency ("FHFA") only for cause similarly violated the separation of powers doctrine.  141 S.Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive").  Plaintiff asserts that like

14

the Directors of the CFPB and the FHFA, the Commissioner of Social Security is a single officer at the head of an administrative agency, and therefore, §902(a)(3)'s attempt to impose any restraints on the President's power to remove the Commissioner also violates the separation of powers doctrine. The Commissioner agrees. (Doc. 19 at 3) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

Plaintiff further asserts that because this removal provision is unconstitutional, any delegations of power by Former Commissioner Saul, including delegations of authority to ALJs or the Appeals Council who determined her benefits claims, were invalid. The Commissioner contends that Plaintiff's argument fails because the ALJ who determined Plaintiff's claim on January 30, 2020, held office on that date, not because of a delegation of authority from Former Commissioner Saul, but because of a ratification of delegated authority on July 16, 2018,[2] by Former Acting Commissioner Nancy Berryhill. (Doc. 19 at 5). And the Commissioner correctly notes that an Acting Commissioner is not subject to § 902(a)(3)'s removal provision, and therefore that provision's constitutionality, or lack thereof, is irrelevant. *See Collins*, 141 S.Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021

---

[2] In *Lucia*, the Supreme Court found that the United States Security Exchange Commission (SEC) ALJs were "inferior officers" under the Appointments Clause, U.S. Const. art II, § 2, cl. 2, and therefore, had to be appointed by a President, a court, or the head of an agency instead of lower-level staff. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018). Although *Lucia* involved ALJs at the SEC, on July 16, 2018, Acting Commissioner Berryhill ratified the appointment of the Social Security Administration's ALJ's and administrative appeals judges who were previously appointed by lower-level staff in response to the ruling in *Lucia*. See SSR 19-1p, 84 Fed Reg. 9582, (2019).

WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from the office at the President's discretion.") (emphasis in original).

Nevertheless, Plaintiff asserts that the ALJ and the Appeals Council adjudicated her disability application pursuant to a delegation of authority from Former Director Saul. (Doc. 16 at 11–12). The Court need not resolve this factual dispute but finds instead that even if Former Director Saul appointed the ALJ and Appeals Council judges[3] who determined Plaintiff's benefits claim, the constitutionality of § 902(a)(3) would not warrant remand for several reasons.

First, even if the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived Former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of severability. As the Supreme Court noted in *Seila Law*, "'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'" 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "'confronting a constitutional flaw in a

---

[3] The Undersigned does not accept Plaintiff's assertion in her Reply that the Commissioner waived any defense to her separation of power claim with regards to the Appeals Council by failing to address that claim in the Memorandum in Opposition. (Doc. 26 at 10–12). Plaintiff only cursorily mentioned the Appeals Council in her Statement of Errors (Doc. 16 at 11–12), and again, failed to provide the Commissioner with fair notice of her Constitutional claim in her Complaint (Doc. 5). In any event, the claim lacks merit with regard to the Appeals Council for the same reasons that the claim lacks merit with regard to the ALJ.

statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.'" *Id*. (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*., 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. Such is the case here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec.*, Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (same).

In addition, even if the removal provision in § 902(a)(3) is unconstitutional, that would not have automatically rendered Former Commissioner Saul's appointment invalid, and thus, it would not have automatically invalidated his actions, including delegating authority to make benefits determinations or ratifying such delegations. In *Collins*, the Supreme Court found the unconstitutional removal provision did not render the FHFA's appointments invalid, and thus did not automatically void the FHFA's actions under the Director. 141 S.Ct. 1787 ("Although the statute unconstitutionally limits the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA [that were challenged on appeal] as void."). Accordingly, infirmities in removal provisions do not automatically void

appointments or actions taken by properly appointed officials. *Alice A. v. Comm'r of Soc. Sec.*, 2021 WL 5514434, *6 (finding that '[t]he infirm *removal* provision does not render Commissioner Saul's *appointment* invalid, which in turn does not render the ALJ's disability determination void.") (emphasis in original); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (finding that the unconstitutional "removal provision does not render the Commissioner's appointment invalid, and thus does not automatically void the SSA's actions under the Commissioner").

Instead, to obtain reversal of an agency decision, a plaintiff must show "compensable harm" flowing from an unconstitutional removal clause. *Collins*, 141 S.Ct. 1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff occurred due to the President's inability to remove a Director of the FHFA except for cause). Here, Plaintiff makes no such showing. Plaintiff asserts that her injuries flow from an illegitimate delegation of power, that her harm involves "government actors exercising power which they did not lawfully possess," and that therefore, her harm should be presumed. (Doc. 26 at 16–18). In so doing, Plaintiff appears to conflate issues that might have presumably flowed from the unconstitutional *appointment* of Former Director Saul with a provision allowing for his unconstitutional *removal*. As explained above, however, appointments are not nullified by an unconstitutional removal provision. Nor are actions taken by a properly appointed official.

In short, Plaintiff has not pointed to a connection between any unconstitutional limit on Former Director Saul's removal and the ALJ's determination denying her benefits. *See also Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) (finding that "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Nor is it likely that Plaintiff could do so, given that any particular ALJ or Appeals Council decision would not concern the

President.  *Cf. Collins*, 141 S.Ct. at 1802 (Kagan, J. concurring) ("The SSA has a single head with for-cause removal protection . . . But . . . I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . .  When an agency decision would not capture a President's attention, his removal authority could not make a difference.").

For all these reasons, the Undersigned finds that Plaintiff's separation of powers claim lacks merit.  Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court

adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   March 8, 2022                    /s/ Kimberly A. Jolson
                                         KIMBERLY A. JOLSON
                                         UNITED STATES MAGISTRATE JUDGE

20